CRAWFORD, Judge
(dissenting):
This case presents three issues of immediate importance and worldwide impact: (1) the domestic aspect of Internet transactions initiated outside the United States that result in the receipt, reproduction, or transmission of electronic images within or from discrete, electronic “space” on Internet servers located within the United States; (2) the extraterritorial application of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2252A (2000), to members of the armed forces stationed overseas; and (3) the providence of a guilty plea to violations of the CPPA when the record clearly demonstrates Appellant’s knowledge of the “actual” nature of the victims, but the military judge explains the offenses to Appellant using language found to be overbroad in Ashcroft v. Free Speech Coalition.[1]
I must respectfully dissent from the lead opinion’s holding that § 2252A does not apply to Appellant’s conduct in Germany, that Appellant’s receipt, reproduction, and distribution of electronic, pornographic images did not occur in the United States, and from the majority’s holding that Appellant’s plea to specification 1 was improvident based on United States v. O’Connor, 58 M.J. 450 (C.A.A.F.2003). In specifications 1, 2, and 3 Appellant was charged under Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000), with knowingly and wrongfully, by means of a computer, mailing, transporting, shipping, receiving, and reproducing child pornography in “interstate or foreign commerce” at an Internet café in Darmstadt, Germany, in violation of § 2252A. He was also charged under Article 134 with receiving child pornography and with possessing child pornography on a United States Army installation, in violation of § 2252A, in specification 4. The mailing, transporting, shipping, receiving, and reproducing occurred at Hotmail and Yahoo! computer servers located in the United States, with each such action having been effected by Appellant’s physical contact with a computer terminal located in Darmstadt, Germany.
The lead opinion takes the position that a citizen-soldier who is knowingly sending, receiving, and reproducing computer images of actual children engaged in graphic sexual conduct in “interstate or foreign commerce,” who is possessing those images on a United States military installation, and — because of the nature of Hotmail and Yahoo! e-mail accounts — whose sending, receipt, reproduc *78 tion, and possession is simultaneously occurring on e-mail servers located in the United States, cannot be prosecuted under § 2252A. Not only is that position unsettling, but it constitutes a dramatic shift in this Court’s view of military criminal jurisdiction.
I. Domestic Application of § 2252A
When Appellant sat in the Netzwerk Internet Café in Darmstadt, Germany, he didn’t open envelopes, remove photographs, copy photographs, place photographs in envelopes, or place those envelopes in a mail drop, at least not in the physical sense. Appellant rented a web browser, which he used to visit Internet websites and to gain access to his Hotmail or Yahoo! e-mail accounts. These particular e-mail accounts are “web-based,” as distinct from e-mail operated through a local client such as Microsoft Outlook (a program that can be locally installed and which creates a local storage facility for e-mail files and attachments). Because “web-based” accounts operate without a local server and consist of discrete pools of information electronically assembled and stored under a user’s filename on a client server owned by the host, all of Appellant’s e-mails — -and their attachments — were “resident” on the Internet servers of Hotmail and Yahoo!, located in the United States.
While this is not the technology many of us grew up with, it is the technology that prevails today. It is the technology that appellants and counsel not infrequently must explain to judges and, more to the point, it is the technology Appellant stipulated to and explained to the military judge during the Care[2] inquiry in this case.
The majority misconstrues the “routed through” language in the stipulation to conclude that all the images — including those attached to e-mail — were located outside the United States when Appellant sent or received them or when he reproduced them, and that when Appellant sent or received them they all merely went “through” the United States in electronic form.
What actually occurred, at least on those occasions that Appellant sent or received images by e-mail, is that Appellant, by typing on the keyboard of a computer in Darmstadt, used his electronic address on a server located in the United States, to send and receive e-mail messages with embedded or attached images, to and from his address on that server. Appellant also used his “space” on the Hotmail and Yahoo! servers in the United States to store pornographic images of children, which was made crystal clear by the language of specification 5,[3] the testimony of Specialist (SPC) Oviatt and Appellant’s admissions during the providency inquiry.
Appellant also admitted to downloading images directly onto the hard drive of a computer at the Netzwerk Internet Café and onto portable disks that Appellant took back to the barracks. But Appellant also admitted that each day, after he had left the Netzwerk Internet Café, many if not all of the images Appellant had collected, reproduced, or sent to others remained stored, under his name, in his user account, on the servers of Hotmail and Yahoo! within the territorial borders of the United States.
Because much of the storage of images, all of the sending, and all of the receiving, actually occurred in the electronic space controlled by Appellant on Hotmail and Yahoo! servers in the United States, the crimes of sending and receiving were committed there.[4] Further, although some of the products of Appellant’s reproduction (e.g., the portable computer disks Appellant took back to his barracks) were located in Germany, much of the actual reproduction occurred on *79 the servers where those images were located, in electronic form, in the United States.
In light of these facts of record, there was a domestic application of § 2252A to specifications 1 through 3.
II. Extraterritoriality
If required to examine § 2252A and Article 134, in an extraterritorial setting, I would follow this Court’s precedents and the great bulk of federal ease law, while considering the worldwide deployment of our forces, and the melding of federal statutes in Article 134.
FACTS
As detailed above, Appellant possessed over sixty images of child pornography on a U.S. military installation in Germany. He also used a computer in a German community to effect the repeated reproduction, transmission, and receipt of child pornography in interstate and foreign commerce. Appellant’s electronic transactions were, at a minimum, routed through Internet servers in the United States:
In Prosecution Exhibit 1, Appellant stipulated that
[a]ll e-mail sent to or received from the accused’s Yahoo or Hotmail e-mail accounts is electronically routed through the respective service’s computers in the United States. As a result, all of the child pornography that the accused had either sent or received using these two accounts was transported through interstate or foreign commerce.
As a matter of practice, over the course of the year, after copying the child pornography onto floppy diskettes, the accused would then take the diskettes to his barracks room in building 4002 on the Cambrai Fritsch Kaserne, Darmstadt, Germany. The Cambrai Fritsch Kaserne is a U.S. Army installation used by and under the control of the United States Government.[5]
Emphasis added,
DISCUSSION
Outside the military context, modern law recognizes five theories in support of extraterritorial application of a sovereign’s jurisdiction: (1) regulating conduct of its citizens; (2) regulating activities which have a substantial territorial effect; (3) regulating extraterritorial conduct when there is a connection between the act and national security; (4) asserting jurisdiction as to crimes against humanity; and (5) asserting jurisdiction where the victim of the act is a citizen of the state asserting jurisdiction.[6]
In the context of United States service-members, Congress’ authority to “make Rules for the Government and Regulation of the land and naval forces,”[7] creates additional sources of jurisdiction under Article 134.
Citizenship
Notwithstanding the common law presumption against extraterritorial application of a sovereign’s law,[8] there remains little question as to the power of Congress to extend application of U.S. criminal statutes to the acts of U.S. citizens undertaken beyond our territorial borders. The extraterritorial reach of federal statutes, at least as to citizens, arose as far back as 1824, when the United States Supreme Court recognized the nationality principle. In The Apollon>[9] the Court stated: “The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens.” Again in 1960, the Court hinted that nationality-based jurisdiction over civilian dependents of military personnel overseas was pos *80 sible but venue would lie in the United States.[10] Clearly, Appellant is a citizen.
Effects
In addition to the nationality justification for jurisdiction, the effects doctrine also applies to conduct from outside the border that has a consequence or effect within the border, provided Congress has the authority in that area. Just as the Federal Government can defend itself “against obstruction ] or fraud wherever perpetrated,”[11] it also can cast a wide net for drug trafficking, or in this case, trafficking in child pornography. In United States v. Felix-Gutierrez,[12] the Ninth Circuit applied a criminal accessory statute— silent as to extraterritorial application — to the murder of a Drug Enforcement Agency (DEA) agent in Mexico. Finding extraterritorial application of the laws of the United States constitutionally permissible, the court emphasized the need to look at both the express and implied congressional intent in deciding whether the law should be given extraterritorial application. Agreeing' with the Fifth Circuit’s analysis in United States v. Baker[13] the Felix-Gutierrez court noted that the effectiveness of the statute would be compromised if the citizens of the United States could commit these offenses abroad without the intercession of the United States Government.[14] Permitting the Government to exercise extraterritorial jurisdiction comports with the international principle of protective jurisdiction because the underlying crime affected the nation itself.[15] As Judge Hand recognized in United States v. Aluminum Co. of America[16] concluding that the Sherman Act applied to conduct that took place entirely outside the United States but had a territorial effect on exports and imports: “It is settled law ... that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends.... ”
Further, construing the statute against extraterritorial application to members of the armed forces stationed abroad has practical effects that would thwart the plainly stated intent of Congress to eradicate child pornography. If this had been a contested case, the material that Appellant transmitted and received could have been obtained pursuant to a search warrant from a United States Internet site.[17] The search would not have required the consent of German officials. This is not an instance where United States law enforcement officials need the assistance, or even indulgence, of another territory to enforce its law.[18] Nor is this an instance of the searching state having a stronger interest in the data than the state in which the data is stored. Both are the same. The searching state knows where the data is and there would be no interference with another state as a byproduct of the search. Just as clearly, this is not an instance of extraterritorial criminal enforcement that would “potentially frustrate one of the central purposes of the presumption against extraterritoriality— namely, the prevention of ‘unintended clashes between our laws and those of other nations which could result in international discord.’ ”[19] As with nearly all other members *81 of our armed forces, Appellant was subject to a Status of Forces Agreement. Such agreements have provided, since before United States v. Gatlin,[20] that “the military authorities of the sending State shall have the right to exercise within the receiving State all criminal and disciplinary jurisdiction conferred on them by the law of the sending State over all persons subject to the military law of that State.”[21] Appellant’s prosecution for these crimes was not merely tolerated by German authorities, it was officially condoned pursuant to an international treaty.
Plain Meaning of § 2252A
While citizenship and impact on “interstate and foreign commerce” provide sufficient bases for jurisdiction, there is an additional basis for applying the statute extraterritorially — the plain meaning and purpose of the statute itself. ‘While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, [extraterritorially] is one of construction, not of legislative power.”[22] “Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. Whether Congress has in fact exercised that authority ... is a matter of statutory construction.”[23]
This case deals with a specific federal statute, i.e., § 2252A, which provides:
(a) Any person who—
(1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;
(2) knowingly receives or distributes—
(A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or
(B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer ...
(5)(B) knowingly possesses any ... computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer ...
shall be punished as provided in subsection (b).
Emphasis added.
When interpreting this statute, it is appropriate to look at the plain meaning of the statute,[24] its history, and the purpose of the statute.[25]
The Commerce Clause grants Congress the power “to regulate commerce with foreign Nations____”[26] Section 2252A was an exercise by Congress of its authority over interstate and foreign commerce. This power to regulate foreign commerce has been broadly construed to encompass all “transactions which either immediately, or at some stage of their progress, must be extraterritorial.”[27]
Certainly, Congress is interested in controlling commerce in cyberspace as evidenced by the statute. This statute is a *82 broad, comprehensive scheme to eradicate, or at least control, sexual exploitation of children. It was part of the CPPA. In expanding the congressional statute, Congress specifically found that “elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct____”[28]
*81 L.Ed.2d 1 (2000)("[W]hen the statute’s language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.’’)(intemal quotation marks and citations omitted).
*82 I cannot join the majority’s conclusion that because the CPPA was enacted to “protect children from abuse,” United States v. Martinelli 62 M.J. 52, 57-58 (C.A.A.F.2005), it therefore focuses on individual victims and cannot fall within the “second category” of criminal statutes described in Bowman. Similar language has been applied by numerous federal circuits in recognizing that many criminal prohibitions enacted by Congress were intended primarily to protect the national interest, as opposed to the property or persons of individuals.[29]
Not only on the weight of decisional law in the federal circuits and our own precedents, but based on the compelling similarities between this Nation’s struggle against the production, importation, distribution, and possession of illegal drugs and the much more recent efforts to combat the creation, distribution, and possession of child pornography, I conclude that, even if applied extraterritorially, Appellant’s plea and conviction by application of § 2252A was jurisdictionally proper.
Appellant’s Military Status
A final rationale for jurisdiction to prosecute Appellant arises under the UCMJ. Pursuant to this authority, Congress has provided that under Article 134 “all disorders and neglects to the prejudice of good order and discipline in the armed forces” or conduct which would bring “discredit upon the armed forces” may be tried under the UCMJ. The UCMJ specifically provides for extraterritorial jurisdiction.[30] In light of Article 36, UCMJ,[31] it is clear that clause 3 of Article 134 contemplates prosecution of crimes such as those enumerated in § 2252A.
Congress delegated authority to the President to prescribe “[pjretrial, trial, and post-trial procedures, including modes of proof, for cases” triable under the UCMJ.[32] In the Manual for Courts-Martial, United States (MCM) (2002 ed.), pt. IV, 1Í 60.c(4)(c)(i) notes that under clause 3 of Article 134, “[tjhere are two types of congressional enactments of local application: specific federal statutes (defining particular crimes), and a general federal statute, the Federal Assimilative Crimes Act (which adopts certain state criminal laws).”
*83 This approach was recognized in United States v. Scholten.[33] In Scholten, this Court held that there are four jurisdictional bases to try an individual for kidnapping overseas, including “interstate or foreign commerce, maritime or territorial jurisdiction, special aircraft jurisdiction and foreign guests of the government.”[34] Even though 18 U.S.C. § 1201(a), the statute at issue in Scholten, does not apply under clause 3, it may be charged under clauses 1 and 2 where the conduct is prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.[35] Thus, assuming Appellant was not engaged in “interstate or foreign commerce,” those clauses would also permit the prosecution of Appellant under the UCMJ.
For all of the above reasons, I respectfully dissent from the majority’s holding that § 2252A does not have extraterritorial application. The impact of this holding is far-reaching because it overlooks our prior case law[36] and forecloses application by military authorities of numerous federal statutes overseas.[37]
III. Providence of the Plea
I also dissent from the majority’s conclusion that Appellant’s pleas were improvident in light of Ashcroft v. Free Speech Coalition.[38] In my dissent from a similarly erroneous conclusion by this Court in O’Connor, 58 M.J. at 456-457 (Crawford, C.J., dissenting), I emphasized that O’Connor’s pleas were factually provident to offenses involving actual children and therefore unaffected by Free Speech Coalition. Notwithstanding nearly unanimous support for this position in the federal circuits that have addressed that very question of law, the majority steadfastly moves this Court, without justification, on a path that threatens, rather than protects, the military community by providing extra “rights” for servicemembers who possess, traffic in, and even create child pornography, even when those acts occur on a military installation.
Actual Children
In explaining the elements of each of the four child pornography specifications, the military judge defined “child pornography” by reading § 2256(8) to Appellant, including the impermissibly overbroad language “appears to be” and “conveys the impression.” The stipulation of fact, however, explicitly recognizes that the children in all sixty-four images appended to the stipulation are actual children: “Rather than focusing on a technical listing of the elements of an offense, this Court looks at the context of the entire record to determine whether an accused is aware of the elements, either explicitly or inferentially.”[39]
Appellant assured the military judge that he understood the stipulation and that everything in it was true. After the defense waived objection, the military judge admitted the document, which provided, in part: “[t]he identity of these children, as well as any lasting damage that may have occurred because of their abuse in these photographs, is not known”; and “[t]he accused never attempted to discover the identities or well-being of these children.”
Virtual children do not have “identities,” they do not suffer “damage” when abused, nor may their “well-being” be restored. Appellant knowingly and voluntarily stipulated as fact that the children in the sixty-four images were real, potentially identifiable, female children, some of whom were prepubescent, and all of whom were abused. Appellant’s understanding of the animate, corporeal na *84 ture of the children depicted in the sixty-four images attached to the record of trial is clear. Moreover, the sixty-four images attached to the record in this case graphically support Appellant’s belief that the images are of actual minors.[40] There is no substantial basis in law and fact to question the providence of Appellant’s plea. Appellant was aware of the elements and the facts objectively support his plea.
The “Specialized Society” Revisited
By departing from the bulk of federal precedent, without articulating any military necessity or distinction, this Court continues to suggest that servicemembers accused of child pornography offenses have First Amendment and trial rights paramount to those extended by the federal circuits to similarly situated civilian defendants prosecuted under the same statute. Further, without even articulating a balance, the majority implicitly promotes the newly elevated rights for accused military child pornographers over those of the military community as a whole.
A. Application of Free Speech Coalition in the Federal Courts
Since Free Speech Coalition, most of the federal courts that have considered eases in which the constitutionally overbroad language of § 2256(8) was employed have looked to the entire record to determine the legal impact of constitutionally impermissible instructions or explanations. Even in contested cases, these courts have found sufficient evidence that images depicted actual children in cases where a pediatric expert testified as to the age of the child depicted and “the photographs appeared to portray real children.” See, e.g., United States v. Bender, 290 F.3d 1279, 1282 (11th Cir.2002)(denying defendants’ free speech claim and noting that “there [was] sufficient evidence that the images portray[ed] real children”). Courts have upheld convictions when the appellate judges’ own viewings left no doubt that “the images shown to the jury ... depicted ... real” children. United States v. Richardson, 304 F.3d 1061, 1064 (11th Cir.2002). The Richardson court “reached [that] conclusion because the evidence clearly established that the children depicted in the images or pictures were actual children.” Id. at 1064-65. In that case, a special agent testified that, based on his training and experience, the images depicted actual children and not what simply appeared to be children.
Other federal courts addressing this issue have upheld convictions where the factfinder concluded that the images depicted actual children or where the appellate court deemed that it must have been so. Padgett v. United States, 302 F.Supp.2d 593, 598-600 (D.S.C.2004)(finding that language of providence inquiry established actual nature of children and that, by appellate court’s own review, photos were of actual children); United States v. Slanina, 359 F.3d 356, 357 (5th Cir.2004) (stating that the “Government was not required to present any additional evidence or expert testimony ... to show that the images downloaded ... depicted real children, and not virtual children”); United States v. Farrelly, 389 F.3d 649, 655 (6th Cir.2004)(affirming conviction where the Government presented “sufficient evidence of actual children” and the trier of fact “was capable of reviewing the evidence to determine whether the Government met its burden to show that the images depicted real children”) (quoting Slanina, 359 F.3d at 357);[41] United States v. Kelly, 314 F.3d 908, 912 (7th Cir.2003)(upholding a guilty plea “[b]ecause regulation of real child pornography remains constitutional ... and Mr. Kelly possessed real child pornography”); United States v. Deaton, 328 F.3d 454, 455 (8th Cir.2003)(reaffirming the reasonableness of a *85 “jury’s conclusion that real children were depicted, even where the images themselves were the only evidence the government presented on the subject.”); United States v. Vig, 167 F.3d 443, 449 (8th Cir.1999)(holding that the “images were viewed by the jury which was in a position to draw its own independent conclusion as to whether real children were depicted.”); United States v. Rearden, 349 F.3d 608, 612-14 (9th Cir.2003)(evidence at trial sufficient to prove real children); United States v. Kimler, 335 F.3d 1132, 1142 (10th Cir.2003)(stating that factfinders are “still capable of distinguishing between real and virtual images”); United States v. Hall, 312 F.3d 1250, 1260 (11th Cir.2002)(affirming a Free Speech Coalition conviction because “no reasonable jury could have found that the images were virtual children”). But see United States v. Hilton, 386 F.3d 13, 18-19 (1st Cir.2004)(because the jury was not required to find that the images were of actual children, even if a commonsense determination would compel such a finding, the conviction could not stand).[42] Thus, it is clear that the great weight of federal authority supports the analysis and conclusions of the Army Court of Criminal Appeals.
B. Treatment of Free Speech Coalition in this Court
This case revisits a familiar question: how is this Court to ensure compliance with Free Speech Coalition when, during the course of court-martial proceedings, the military judge employed the statutory language found by Free Speech Coalition to be overbroad — language that could ostensibly permit conviction based on visual depictions of virtual children? In this case, that question is narrowed to the context of a Care inquiry.
The answer, of course, begins with our duty to follow the decisions of our superior court. But when we impose upon the Government a greater burden than the Supreme Court requires, we must first articulate a balance between the First Amendment and trial rights of a military accused, on the one hand, and the military community’s interest in good order and discipline on the other. Both the servicemember and the military community share an interest in a lawful, rational application of the CPPA. Unfortunately, while maintaining a position that affords military child pornographers a level of sanctuary unrecognized by other jurisdictions, the majority provides no balancing and serves only one interest.
As noted above, a growing majority of federal courts have declined an overly restrictive application of Free Speech Coalition, in favor of a measured approach, e.g., consideration of waiver, United States v. Hay, 231 F.3d 630, 639 (9th Cir.2000), plain error, Hall, 312 F.3d at 1259, and other legal theories, in conjunction with an examination of the facts of each case, including the nature and characteristics of the prohibited images themselves. Richardson, 304 F.3d at 1064.
The majority has rejected that approach and has essentially established a per se reversal rule to be applied to any case in which the unconstitutionally overbroad language is used, unless the conviction can be upheld under clauses 1 and 2 of Article 134. The application of that rule in this case operates to exonerate an accused who clearly admitted to trafficking in pornographic images of actual early teen, preteen, and kindergarten girls.
C. Balancing — Now and in Future Cases
The approach this Court should take in Appellant’s case need not be inconsistent with the Court’s holding in O’Connor:
For present purposes, however, a provident guilty plea to a violation of the CPPA provision at issue here must reflect that an accused has violated those portions of the statute upheld by the Supreme Court. In light of that, and in the absence of any discussion or focus in the record before us *86 regarding the “actual” character of the images, we cannot view Appellant’s plea of guilty to violations of the CPPA as provident.
We have long recognized that the First Amendment rights of civilians and members of the armed forces are not necessarily coextensive. At the same time, however, we must ensure that the connection between any conduct protected by the First Amendment and its effect on the military environment be closely examined.
58 M.J. at 454r-455 (citations omitted).
This Court’s disposition of Appellant’s case should, at a minimum, treat those very same considerations addressed by O’Connor: evaluating any “discussion or focus in the record before us regarding the ‘actual’ character of the images,” and ensuring “that the connection between any conduct protected by the First Amendment and its effect in the military environment [is] closely examined.” Id. Instead, without explanation or elaboration, the majority purports to rely on O’Connor, while conducting no balancing and implicitly declining to adopt the reasoning of the clear majority of Article III courts.
As a matter of general practice, when we choose to depart from Supreme Court precedent, or from the reasoning of the majority of the federal circuit courts that have followed Supreme Court precedent in construing and applying a constitutional or statutory provision, and when that departure is not required by legislative or executive mandate, this Court should articulate the military necessity or distinction that compels our reasoning. See, e.g., United States v. Roberts, 59 M.J. 323, 327 (C.A.A.F.2004) (rejecting Supreme Court standard for evaluating discovery violation and applying a more stringent standard based on “military practice”); United States v. Unrue, 22 C.M.A. 466, 469, 47 C.M.R. 556, 559 (C.M.A.1973)(recognizing “military necessity” in evaluating reasonableness of search and seizure); United States v. Wiesen, 57 M.J. 48, 50 (C.A.A.F.2002)(declining to view court member challenge “through the prism of the Sixth Amendment”); United States v. Moore, 58 M.J. 466, 469 (C.A.A.F.2003)(applying “good order and discipline” rationale in validating Government’s abrogation of First Amendment free speech rights); United States v. Brown, 45 M.J. 389, 395 (C.A.A.F.1996)(applying “clear danger to loyalty, discipline, mission, or morale” standard to First Amendment claim).
“This Court has long recognized that the military is, by necessity, a specialized society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history.” Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Balancing this recognition of the military’s specialized need for enhanced discipline and regulation, our Court has long maintained vigilance in preserving the rights of servicemembers in the court-martial process. See generally United States v. Jacoby, 11 C.M.A. 428, 29 C.M.R. 244 (1960). When we perform this balancing, however, we must not fail to consider the fabric of the “specialized society” in which servicemembers and their families exist. The Department of Defense and the military departments have emphasized that this “specialized society” consists not only of service-members, but of their families as well.[43]
When this Court applies a U.S.Code provision and our superior court’s interpretation thereof in a manner inconsistent with the bulk of Article III courts — presumably for the purpose of providing an elevated level of protection for the trial rights of a military accused — we must weigh the reasons for our divergent application of that statute against the concomitant reduction in the level of protection that statute would otherwise provide to the “specialized society” we also serve. As noted, that society is populated not only by the uniformed men and women who bravely serve our Nation, but by their *87 spouses and children, all of whom have every right to expect a measured and rational application of law by trial and appellate courts. More particularly, in light of this Court’s historical balance between individual First Amendment rights and the needs of the “specialized society,” the members of that society could hardly anticipate that this Court would, despite the weight of federal decisions to the contrary, construe a Supreme Court decision so as to elevate the right of an individual servicemember to traffic in child pornography above the need of that “specialized society” for good order and discipline.
How then, without being compelled to do so by our superior court, by Congress, or by the President, does this Court elevate the First Amendment and fair trial rights of servicemembers over the military’s need for good order and discipline? Are good order and discipline, as well as the safety and security of the community not threatened by the creation and proliferation of child pornography within that community? This Court’s application of Free Speech Coalition not only places us in the minority of federal fora, but, for reasons that remain a mystery, confers on servicemembers accused of owning, distributing, and trafficking in child pornography a status that exalts their constitutional rights above those of civilians accused of identical crimes, while unnecessarily and unintentionally denigrating the legitimate interests of the thousands of other service-members and their families who comprise the “specialized society” recognized by the Supreme Court for over thirty years.
IV. Conclusion
Both on the question of extraterritorial application of § 2252A and on implementation of Free Speech Coalition, the majority moves this Court still further from the mainstream of federal practice. In doing so, the lead opinion departs from our own precedent by failing to conduct a balancing of competing rights and interests. For these reasons alone, I must respectfully dissent. Because Appellant’s stipulation of fact provides no “substantial basis in law and fact to question the providence of,” United States v. Prater, 32 M.J. 433 (C.M.A.1991), Appellant’s pleas to possession and trafficking in child pornography, because the images in question clearly depict actual minors, and because Appellant waived the issue,[44] I must also respectfully dissent. Finally, I respectfully dissent from the majority’s declination to find both that specifications 1, 2, and 3 were not committed within the territory of the United States and that Appellant’s pleas provident to the lesser included offense of conduct prejudicial to good order and discipline or to bring discredit upon the armed forces.[45]

. 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

. United States v. Care, 18 C.M.A. 535, 40 C.M.R. 247 (1969).

. "Specification 5 states that Appellant wrongfully endeavor[ed] to impede an investigation into his own misconduct by asking SPC Morgan A. Oviatt to destroy evidence that the said SPC Christopher P. Martinelli had received and possessed child pornography in violation of 18 U.S.Code § 2252A, to wit: by deleting all files with attachments from his two electronic mail accounts." Emphasis added.

. As reflected in the specifications, they were simultaneously committed in Germany, a proposition discussed below.

. Before this Court, the Government noted “the child pornography at issue moved in ‘foreign commerce’ because it was filtered through internet service providers operating from the United States.”

. See Restatement (Third) Foreign Relations Law §§ 401-402 (1986).

. U.S. Const, art. I, § 8, cl. 13.

. Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949).

. 9 Wheat. 362, 22 U.S. 362, 370, 6 L.Ed. 111 (1824).

. Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); see also United States ex rel. Toth v. Quarles, 350 U.S. 11, 21, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

. United States v. Bowman, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922).

. 940 F.2d 1200, 1204 (9th Cir.1991).

. 609 F.2d 134, 136 (5th Cir.1980).

. Felix-Gutierrez, 940 F.2d at 1204.

. See id. at 1206.

. 148 F.2d 416, 443 (2d Cir.1945) (citations omitted).

. See generally United States v. Maxwell, 45 M.J. 406 (C.A.A.F.1996)(warrant executed at site of interstate Internet service provider).

. See generally Yahoo!, Inc. v. La Ligue Contre Le Racisme et L’Antisemitisme, 169 F.Supp.2d 1181 (N.D.Cal.2001)(court declined to enforce a French order, but did not rule that the French were without proper jurisdiction to prevent the distribution of anti-Semitism on the Internet in France).

. United States v. Gatlin, 216 F.3d 207, 216 n. 11 (2d Cir.2000)(quoting Equal Employment Opportunity Commission v. Arabian American Oil Co. (Aramco), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

. Id. at 207.

. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, art. VII § 1(a), June 19, 1951, 4 U.S.T. 1792.

. Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375 (1932) (citations omitted).

. Aramco, 499 U.S. at 248, 111 S.Ct. 1227.

. Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6, 120 S.Ct. 1942, 147

. The purpose of the statute might be an important aspect of statutory interpretation. Geier v. American Honda Motor Co., 529 U.S. 861, 888, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

. U.S. Const, art. I, § 8, cl. 3.

. Veazie v. Moor, 55 U.S. 568, 573, 14 How. 568, 14 L.Ed. 545 (1852).

. Child Pornography Prevention Act, Pub.L. No. 104-208, div. A., tit. I, § 121(1)(13), 110 Stat. 3009.

. E.g., United States v. Harvey, 2 F.3d 1318 (3d Cir.1993) (possession of child pornography under 18 U.S.C. § 2252(a)(4)(B) (subject to aggravated punishment even though aggravating factor occurred in Philippines)); United States v. Wright-Barker, 784 F.2d 161 (3d Cir.1986) (drug offenses on the high seas); United States v. Thomas, 893 F.2d 1066 (9th Cir.l990)(using a minor in Mexico to produce child pornography violating 18 U.S.C. § 2251(a)); Chandler v. United States, 171 F.2d 921 (1st Cir.1948)(treason by U.S. citizen in Germany); United States v. Yousef, 327 F.3d 56 (2d Cir.2003)(attempting to damage U.S. aircraft in flight outside U.S.); United States v. Brown, 549 F.2d 954 (4th Cir.l977)(conspiracy to import heroin to U.S. from Germany involving an Army sergeant stationed in Germany); United States v. Erdos, 474 F.2d 157 (4th Cir.1973)(murder of U.S. citizen by U.S. citizen at U.S. embassy in Guinea); United States v. Perez-Herrera, 610 F.2d 289 (5th Cir.1980)(conspiracy and attempted importation of marijuana into U.S. from high seas); United States v. Baker, 609 F.2d 134 (5th Cir.1980)(possession with intent to distribute marijuana nine miles off Florida coast); United States v. Dawn, 129 F.3d 878 (7th Cir.1997)(possession of child pornography under 18 U.S.C. § 2252(a) subject to aggravated punishment even though aggravating factor occurred in Honduras); United States v. Schmucker-Bula, 609 F.2d 399 (7th Cir.1980)(conspiracy to import cocaine in Colombia); United States v. Plummer, 221 F.3d 1298 (11th Cir.2000)(attempted smuggling forty miles off Florida coast); Felix-Gutierrez, 940 F.2d 1200 (kidnapping and murder of DEA agent in Mexico).

. Article 5, UCMJ, 10 U.S.C. § 805 (2000).

. 10 U.S.C. § 836 (2000).

. Id. at § 836(a).

. 17 M.J. 171 (C.M.A.1984).

. Id. at 173 (citation and internal quotation marks omitted).

. Id. at 173-74.

. See, e.g., United States v. Collins, 7 M.J. 188 (C.M.A.1979); United States v. Jackson, 17 C.M.A. 580, 38 C.M.R. 378 (1968); United States v. Wilmot, 11 C.M.A. 698, 29 C.M.R. 514 (1960); United States v. Blevens, 5 C.M.A. 480, 18 C.M.R. 104 (1955).

. See, e.g., Espionage Act of 1900, 18 U.S.C. § 792-99 (2000).

. 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

. United States v. Redlinski, 58 M.J. 117, 119 (C.A.A.F.2003) (citation omitted).

. See, e.g., images 58, 59, 60, and 63 (attached to the stipulation of fact). These images unquestionably depict actual female children of kindergarten age in graphic sexual poses.

. See, e.g., 3 Leonard B. Sand et al., Modem Federal Jury Instructions — Criminal, Inst. 62-22 (2005) (“You may consider all of the evidence, including your viewing of the depiction, in determining whether the depiction portrayed an actual person under the age of eighteen engaging in sexually explicit conduct.”).

. See also United States v. Maxwell, 49 Fed. Appx. 410, 411 (4th Cir.2002)(affirming pre-Free Speech Coalition guilty plea on the basis that pornography was of actual children); United States v. Roberts, 84 Fed.Appx. 440, 441 (5th Cir.2004)(denying attack on pre-Free Speech Coalition conviction on ground that detailed testimonial description of pictures established their actual nature).

. See, e.g., Department of Defense (DoD) Directive, Family Policy, at E3.1.1 (Dec. 30, 1988) ("DoD personnel and their families are the most valuable resource in support of the national defense. DoD Families serve as a force multiplier, contributing to the readiness and retention of quality personnel. The goal is a combat-ready force supported by families whose quality of life reflects the high standards and pride of the Nation they defend.”).

. O’Connor, 58 M.J. at 455-57 (Crawford, C.J., dissenting).

. Id. at 457-59.