UNITED STATES, Appellant and Cross-Appellee

v

MARSHALL R. WILMOT, Airman First Class, U. S. Air Force, Appellee and Cross-Appellant

11 USCMA 698, 29 CMR 514

No. 13,787

Decided July 29, 1960

*Colonel John F. Hannigan* and *Major Lawrence J. Gross* were on the brief for Appellant and Cross-Appellee, United States.

*Lieutenant Colonel James L. Kilgore* and *Major Charles K. Rush* were on the brief for Appellee and Cross-Appellant, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of the following offenses: (1) Violation of an Air Force regulation by transporting, on or about March 28, 1959, certain narcotics of an aggregate weight of 4574 grams (approximately ten pounds) in Government aircraft for financial gain (Charge I and its specification); (2) wrongful possession, on or about March 28, 1959, of specified narcotics (Charge II, specification 1); and (3) wrongfully and knowingly bringing narcotics into Yokota Air Base Japan (Charge II, specification 2). The sentence included a dishonorable discharge and confinement at hard labor for five years. The convening authority affirmed, but on further review an Air Force board of review concluded that the allegations in the third specification were insufficient to spell out an offense under the Narcotic Drugs Import and Export Act (21 USC §§ 171–185), as intended by the pleader. Accordingly, it set aside the findings of guilty of specification 2, Charge II, and reassessed the sentence on the basis of the remaining findings of guilty.

Both the Government and the accused challenge the correctness of the board of review decision. The former

contends, primarily, that the board of review erred in holding that specification 2, Charge II, does not allege a violation under the Narcotics Act; the latter's basic contention is that the offenses charged are essentially the same, and, consequently, he was prejudiced at trial by the law officer's denial of defense motions based on that premise. We turn first to the questions certified for review by The Judge Advocate General of the Air Force.

Since it is agreed by the parties that the specification alleging wrongful introduction into Yokota Air Base is founded upon the Narcotic Drugs Import and Export Act, we need not consider whether, apart from the proscriptions of that Act, it is conduct to the prejudice of good order and discipline or to the discredit of the armed forces to bring wrongfully narcotics onto a military installation. A person violates the narcotic import act if he fraudulently or knowingly "imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction." At trial, defense counsel moved to dismiss the specification on the ground that the act does not apply to an American military base in a foreign nation. The motion was denied. The staff judge advocate reviewed the rul-

ing in the post-trial proceedings. In a thorough analysis of the issue he said:

". . . [T]he trial's focal point was the matter of whether the offense denounced by Section 174 of Title 21 is one which can be committed outside the geographic limits of the United States and, if that first question takes an affirmative answer, whether 'the facilities and areas' furnished the United States Forces, Japan, by that host country are such 'territory under the control or jurisdiction' of the United States. . . .

. . . . . . .

". . . What . . . did Congress mean by the words 'territory under its control or jurisdiction'?

"The first section of the Narcotics Control Act spells out the definitions of terms used in the Act; it provides in part that 'The term "United States", when used in a geographical sense, includes the several States and Territories, and the District of Columbia' (21 USC 171(b)). Accordingly, Section 174, in proscribing the bringing of narcotics 'into the United States or any territory under its control or jurisdiction,' certainly contemplated territories other than American political subdivisions. Otherwise, the additional language would be nugatory and futile. Incidentally, I can conceive no Constitutional ground for objection to this conclusion, and it is decidedly within the public interest to punish unauthorized traffic in narcotics. Having initially concluded that the statute does reach beyond the geographic limits of the United States, the second query is posed—is Yokota Air Base a territory under the control or jurisdiction of the United States?

"From the evidence adduced at trial it is well-established that Yokota Air Base, an integral part of Japan, has been delivered over to the United States for its 'exclusive use' and that the latter is empowered to use it in such manner as is appropriate to carry out the provisions of the Security Treaty between the two nations (Art. III, Admin Agrmt). The United States has, for practical purposes, police power unfettered by Japan within the area (Art. XVII, Admin Agrmt); the terms of its occupation are potentially permanent, though, of course, by mutual agreement the installation may be returned to Japan.

. . . . . . .

". . . [The Act's] own terms of limitation are fundamental to defining the crimes it denounces, and by them it draws its own geographic restrictions. The unique language employed makes it crystal clear that the Congress intended to proscribe the importation of habit-forming drugs into any place it was authorized to police. This conclusion is inescapable; there is no Constitutional or international prohibition against United States criminal law extending to regulate American citizens' conduct on United States Forces, Japan, installations, else the Uniform Code of Military justice [sic] itself would be ineffective there; the United States has a vital interest in regulating narcotics traffic on these installations for it strikes at the heart of military prowess and proficiency; having that interest and being unimpeded by other prohibitions against the exercise of such jurisdiction, it would be flaunting reality to say that Congress did not intend to extend the proscription against importation to protect military installations in Japan as well as other executive, i.e., diplomatic, compounds there and in other foreign countries. It may well be that in 1915 the Tenth Circuit Court of Appeals was correct in finding the statute then in force to be an exercise of the nation's power to regulate its incoming foreign commerce (Steinfeld, supra), but that is not to say that under the vastly altered circumstances of today—or even those at that time—there is no other basis for this sort of legislation. In addition to its vested interest in protecting the effectiveness of its Armed Forces, the United States has a vital

public interest in regulating narcotics in the hands of its citizens and in the military communities they comprise regardless of where located."

The board of review took a much more narrow approach to the act than did the staff judge advocate cate. Starting with the general rule that in the absence of a specific provision therefor a criminal statute has no application outside the areas of sovereign control, it concluded that the "juridical nature" of the interests of the United States in the Yokota Air Base, as defined by treaty and administrative agreement with Japan, is not such as to amount to sovereign control, and, therefore, the base is not a territory within the meaning of the narcotic act. In our opinion, the board of review was wrong. The able discussion by the staff judge advocate substantially reflects our own construction of the Act and we could comfortably rest upon the parts of his review which we quoted. However, some of the reasoning of the board of review merits additional consideration.

**Headnote 1**

Apparently the crucial point for the board of review was the supposed absence of United Sates sovereignty over the areas of control entrusted to it by the Japanese Government under the Security Treaty and the Administrative Agreements. Thus, it specifically distinguished the juridical interests of the United States in Yokota Air Base from such other areas as American Samoa, Guantanamo Bay in Cuba and the Canal Zone, by observing that in the latter areas the United States was "at least technically sovereign." This line of reasoning has a fundamental fault in that it overlooks the significant differentiation in the areas listed in the statute. Three broad areas are delineated. The first is the United States, which includes the States, the District of Columbia and the Territories; the second group is composed of territories "under the control" of the United States; and the last category consists of territories under the "jurisdiction" of the United

States. If the distinction between classes two and three means anything, it must be that territories under the "control" of the United States contemplates something different from areas under the "jurisdiction" of the United States. Without elaborating on the point, it would seem that control means simply possession of the power to regulate the area, without regard to its precise definition as an attribute of sovereignty in the context of relationships between nations. The Administrative Agreements between Japan and the United States endow the latter with "rights, power and authority . . . which are necessary or appropriate for . . . establishment, use, operation, defense or control" of the areas allocated to the United States. These provisions are sufficient to make the air base a territory "under the control" of the United States within the meaning of the narcotic import act. But even if, as the board of review held, the nature of the control must be juridical in character, then the Administrative Agreements make clear, that the authority of the United States in the areas allocated to it by Japan has that quality. The United States was granted the exclusive power to conduct searches and make seizures of persons and property within the physical areas granted to it. The right to make searches and to effect seizures is the right of the sovereign.

The board of review also emphasized that the assignment of bases to the United States was for the sole purpose of establishing and operating bases for the common defense of the United States and Japan, and did not entail the ceding of "complete and unqualified title in the United States." Neither the limited purpose of American control, nor the absence of title, placed the base outside the reach of the import statute. In Luckenback Steamship Co. v United States, 280 US 173, 74 L ed 356, 50 S Ct 148, the United States Supreme Court, in accord with earlier rulings by the Attorney General and the Postmaster General of the United States, held that irrespective of the extent of the grant

**701**

of sovereignty over the Canal Zone to the United States by the Republic of Panama, ports within the Canal Zone were "foreign" ports, within the meaning of certain tariff and postal department acts. Although the foreign character of the Canal Zone was established for these purposes by the Supreme Court and earlier rulings of his own, the Attorney General submitted an opinion to the Secretary of War to the effect that the Canal Zone was territory under the control or jurisdiction of the United States within the meaning of the narcotic import act. 30 Op Atty Gen 271. A decade and a half later, the Attorney General reviewed the status of Guantanamo Bay Naval Base, which, by treaty with Cuba, was leased to the United States to enable it to maintain the independence of Cuba and its own defense. Comparing the Canal Zone grant with the Cuban agreement, the Attorney General said:

"This would appear to be no less comprehensive a grant than the lease from Cuba. Without intending to imply any idea of a limitation upon our authority, in either case, I must conclude that in one, no less than in the other, we acquired 'a place subject to the use, occupation and control of the United States for a particular purpose,' and that therefore the naval station, no less than the Canal Zone, is not a 'possession' of the United States, as the word is used in the tariff laws." [35 Op Atty Gen 536, 540.]

Significantly, the conclusion that the special purpose of United States possession of Guantanamo Bay did not change its character as a foreign port for tariff purposes, contains the express caveat that the definition did not lessen the United States authority over the base for other purposes. On the contrary, the analogy between the two grants suggests that the Guantanamo Bay lease, like the Canal Zone grant, comes within the purview of the narcotics import act. Be that as it may, in our opinion, territories subject to the control of the United States for a special purpose, and under a grant of power less than that of full and exclusive sovereignty, come within the purview of the statute.

Accordingly, we answer the first certified question in the negative, and hold that the board of review erred in concluding that Charge II, specification 2, does not state an offense.

Reinstatement of specification 2, Charge II, as sufficient in law brings up the question whether the offense alleged therein is separate from Charge I and its specificaton, for the purpose of punishment.[1] The accused contends that the specifications are based upon a single act and are not separately punishable. He maintains that the evidence required to prove that he transported narcotics in a Government airplane, as alleged in the specification of Charge I, also proves the offense charged in specification 2, Charge II. See United States v Rosen, 9 USCMA 175, 25 CMR 437; United States v Posnick, 8 USCMA 201, 24 CMR 11. The claim has no merit. For our purposes, it is sufficient to point out that proof of the facts alleged in Charge I still leaves open the question of whether Yokota Air Base Japan, an area located in a foreign country, is territory under the control of the United States; conversely, evidence that the accused imported narcotics into the base by means of a Government aircraft does not establish that he did so for financial gain, as required by Charge I. The offenses are, therefore, separate for the purpose of punishment. Accordingly, there is no error, as contended by the accused, in the law officer's denial of the motion to dismiss specification 2 on the ground that it constituted an unreasonable multiplicity of charges, and the motion to instruct the court-martial that all the charges were multiplicious for sentence purposes.

The decision of the board of review

---

[1] At trial, the law officer instructed the court-martial that the two specifications of Charge II were not separate for punishment purposes. We need not consider the validity of that ruling.

is reversed. The record of trial is returned to The Judge Advocate General for resubmission to the board of review for further consideration of the case in the light of this opinion.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting):

I dissent.

Unlike my brothers, I am of the view that the Narcotic Drugs Import and Export Act, 21 USC § 171, *et seq*, does not apply to the introduction of opium derivatives into a United States air base located within the boundaries of another sovereign nation.

Unless Congress has expressly or by clear implication indicated that a criminal statute is to be applied beyond the territorial limits of the United States, it should not be so interpreted that the legislation is applied extraterritorially. United States v Bowman, 260 US 94, 67 L ed 149, 43 S Ct 39 (1922).

Originally, the statute now before us provided as follows:

". . . [I]f any person shall fraudulently or knowingly *import or bring into the United States,* or assist in so doing, any opium or any preparation or derivative thereof contrary to law, . . . the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or by imprisonment for any time not exceeding two years, or both." [Act of February 9, 1909, 35 Stat 614.] [Emphasis supplied.]

In United States v Caminata, 194 Fed 903 (ED Pa) (1912), the foregoing legislation was held to apply whenever opium or its derivatives were brought by vessel within the territorial waters of the United States regardless of whether the drug had been landed.

In 1922, the section in question was amended by the Act of May 26, 1922, 42 Stat 596, thereby providing:

". . . [I]f any person fraudulently or knowingly imports or brings any narcotic drug *into the United States or any territory under its control or jurisdiction,* contrary to law, . . . such person shall upon conviction be fined not more than $5,000 and imprisoned for not more than ten years." [42 Stat 596.] [Emphasis supplied.]

The principal opinion concludes that the change in language in the statute embraces United States military installations overseas. Thus, it reasons that the definition of the term "United States" elsewhere in the Act "includes the several States and Territories, and the District of Columbia." 21 USC § 171. Hence, it is argued that to exclude foreign bases from the operation of the Act renders the phrase "any territory under its control or jurisdiction" meaningless, as Territories are already defined as a part of the "United States."

I deem this approach essentially negative; what must govern us here is the intent of Congress. United States v Bowman, supra. Its purpose in amending the statute was no more than an express adoption of the rule laid down in United States v Caminata, supra, to the effect that the statute also prohibited the importation of narcotics into United States territorial waters. Palmero v United States, 112 F2d 922 (CA 1st Cir) (1940). In that case, Circuit Judge Mahoney adverted to the legislative history of the enactment and declared, at page 924:

"When Congress amended the Narcotic Drugs Import and Export Act in 1922, the Ways and Means Committee of the House of Representatives in its report (H. Rep. No. 852, 76 [sic] Cong. 2d Sess. dated March 27, 1922) recognized the force and validity of the reasoning of the Court in United States v Caminata, supra, by citing it in support of *the legislative intent to penalize not only the importation of opium across customs lines, but also the bringing of it into the territorial limits of the United States.*" [Emphasis supplied.]

In short, Congress recognized that other courts might disregard the *Caminata* decision and require the Government to establish the actual landing of narcotics in order to dem-

onstrate an importation or bringing into the United States. Accordingly, they changed the language of 21 USC § 174, supra, to include "any territory under its [the United States'] control or jurisdiction." That, however, is a far cry from saying that the statute has extraterritorial effect.

Indeed, in discussing *another section of the same Act,* Congress expressly adverted to the need for extraterritorial application of the provisions governing export of opium from the United States to certain areas in China controlled by our Government. Accordingly, it provided for that requirement by including in the subsequently enacted legislation a prohibition against *export* of opium "from the United States, or from territory under its control or jurisdiction, *or from countries in which the United States exercises extraterritorial jurisdiction, any narcotic drug to any other country."* (Emphasis supplied.) 21 USC § 182(a); House Report No. 852, 67th Congress, 2d 'Session, page 10. That provision persists in the Narcotic Drugs Import and Export Control Act today. It would be strange to find Congress expressly providing for extraterritorial effect in one section of enacted legislation and omitting it in another if they intended for the entire law to apply beyond our boundaries. It is even stranger to afford that construction to legislation which the Ways and Means Committee stated was intended only to adopt the *Caminata* rule, and to apply only within our territorial limits. House Report, supra, page 9.

Aside from the foregoing, it is clear that the phrase "territory under its control or jurisdiction" can be interpreted in another manner which fills it with meaning beyond the definition in 21 USC § 171, supra, of the term "United States." Thus, without reference to the maritime jurisdiction of the United States, it might well have been intended to apply to those areas over which this Government exercises control but which do not have the status of "Territories." For example, Congress' language may have swept into the Act's protections such pos-

session as American Samoa, Guam, or, indeed, the mandated territory of Okinawa. Be that as it may, it was surely never intended to govern the trafficking in narcotics on United States military installations simply because we, under the Code, possess the power to try members of the armed services who may be stationed there.

Finally, I point out to my brothers another defect in their rationale that the Japanese Administrative Agreement may be interpreted to grant the United States such control over Yokota Air Base that the reservation is thus swept under the Narcotic Drugs Import and Export Control Act, supra. True it is that the Agreement grants certain rights to the United States with respect to the exercise of jurisdiction over the Base and military personnel thereon. It is certainly not true, however, that we thus gain our jurisdiction over military personnel. That authority exists by virtue of the Congressional intent that the provisions of the Uniform Code of Military Justice apply to all members of the armed forces without respect to their location at the time of the commission of an offense. Indeed, the Administrative Agreement deals not with jurisdiction but with the order in which Japan and the United States may exercise concurrent authority over American military bases and the personnel who man them. See Snee and Pye, *Status of Forces Agreement and Criminal Jurisdiction,* page 61 (1957); Security Treaty Between the United States of America and Japan, September 8, 1951, 3 U.S. Treaties and Other International Agreements 3329. It is difficult to perceive how this international arrangement, into which the two nations entered in 1953, can be said to relate back and give extraterritorial effect to a statute enacted in 1922. In short, the error into which I believe the majority fall is their failure to confine consideration of the extraterritorial effect of the Act in question to pertinent evidence of the legislative intent.

In sum, it is my view that a reading of the Narcotic Drugs Import and Export Control Act, supra, in light of its

legislative history and its prior judicial construction requires the conclusion that it was intended to eliminate trafficking in narcotics within the territorial limits of the United States and its possessions. House Report, supra; Palmero v United States, supra. When my brothers extend its application to foreign bases, I believe they unaccountably and unconscionably broaden the purpose of the Act. Accordingly, I must disagree with their reversal of the board of review's decision.

As I believe that the board acted properly in dismissing specification 2 of Charge II and reassessing the sentence on the remaining findings of guilty, the question whether that count was separately punishable becomes moot. Thus, I need not express my views on the granted issue at this time.

I would affirm the decision of the board of review.