GIERKE, Chief Judge
(concurring in part and dissenting in part):
I agree with the majority that Appellant’s plea to specification 1 was improvident under United States v. O’Connor,[1] and I agree that his guilty pleas to the other specifications based on the Child Pornography Prevention Act of 1996 (CPPA)[2] cannot be deemed provident to the lesser included offenses under clauses 1 and 2 of Article 134[3] based the principles discussed in United States v. Mason.[4] Because the majority remands each of the CPPA-based specifications due to the improvidency of Appellant’s pleas, I believe the question of whether the CPPA has extraterritorial application does not need to be reached in this case. But because the majority chooses to decide the extraterritoriality issue, I must respectfully dissent in part. I cannot agree that the CPPA does not have extraterritorial application.
The most important step in determining if the CPPA applies extraterritorially in this case is to discern whether Congress intended the CPPA to prohibit the acts of a service-member stationed overseas who sends, receives, reproduces, and possesses child pornography.[5] To complete this task, we must engage in what Judge Learned Hand called “[by] far the greatest part” of the law: “the interpretation of words.”[6] As we do so, we must remember that the words we interpret “cover many diverse instances,” including instances that their authors did not fully foresee.[7] Interpretation is “necessarily an act of creative imagination” that requires judges to put themselves in the place of the author of those words and determine “how he would have dealt with the instance that has arisen.”[8]
Putting myself in the place of the Congress that adopted the CPPA and determining “how [it] would have dealt with the instance that has arisen,”[9] I disagree with the majority’s conclusion that Congress did not intend to prohibit a servicemember from possessing child pornography on a United States military installation or from receiving or reproducing that same pornography that was routed through Internet servers located in the United States.[10] Because Appellant was *69 in Germany when he sent the pornography over the Internet, I also disagree with the majority that applying the CPPA to Appellant’s offense of sending the child pornography is a domestic application of the Act.[11] I believe Congress intended the CPPA to apply extraterritorially and that the Act reaches Appellant’s conduct in this case.[12]
I. The presumption against extraterritoriality
The Supreme Court explained the presumption against extraterritoriality in Equal Employment Opportunity Commission v. Arabian American Oil Company (Aramco).[13] Aramco was a civil case that involved racial discrimination in employment practices by United States companies who employ United States citizens abroad.[14] The Supreme Court thus applied the presumption against extraterritoriality to employment practices abroad -which is exactly the kind of domestic concern to which the presumption should apply. In doing so, the Supreme Court made clear that the presumption applies unless the “language in the [relevant statute] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or some measure of legislative control.”[15]
In United States v. Bowman, the Supreme Court was confronted with a jurisdictional issue in a case involving three American citizens and one British citizen who planned to defraud a corporation in which the United States was a stockholder.[16] The statute under which the defendants were to be prosecuted contained no explicit grant of extraterritorial jurisdiction to try the offenders on the high seas, where the crime took place.[17] In response to the absence of an explicit statement of extraterritorial application in that particular criminal statute, the Supreme Court applied and clarified the exception to the presumption against extraterritoriality.[18]
The Supreme Court delineated two types of criminal offenses in Bowman. The nature of some criminal offenses, such as those crimes against private individuals or their property which “affect the peace and good order of the community,” is such that the acts that constitute the offenses occur locally.[19] But other criminal offenses “are such that to limit their locus to the strictly territo *70 rial jurisdiction would be greatly to curtail the scope and usefulness of the statute ____”[20] Thus, when Congress does not explicitly state in the plain language of a particular criminal statute that it intends for that statute to apply extraterritorially, courts can infer such intent “from the nature of the offenses and Congress’ other legislative efforts to eliminate the type of crime involved.”[21]
I interpret the Bowman language as drawing a dividing line between those criminal offenses that are “domestic” in nature and those whose nature “warrant[s] a broad sweep of power.”[22] For example, a U.S. citizen’s assault on his next-door neighbor would affect the “peace and good order of the community” in his neighborhood and is a domestic crime. The nature of this offense does not warrant a sweep of power any broader than that provided to the local police force to arrest him. However, if a U.S. citizen commits a criminal offense whose effects are not confined to one particular situs — for example, smuggling illegal drugs between countries or trafficking in child pornography over the Internet — then, the nature of that offense warrants a broader sweep of power.
The majority reads the language in Aramco and Bowman to allow an exception to the presumption only for certain types of criminal statutes — those enacted so that the Government can defend itself against obstruction or fraud.[23] However, I do not read this language as narrowly as the majority. Notably, Bowman was a case about fraud against the Government and, thus, the limiting language on which the majority relies directly applies to the circumstances of that case.[24]
Moreover, I believe that a narrow interpretation of Bowman is inconsistent with the purpose of the criminal offense exception the Supreme Court recognized. Like Judge Sand, I think the underlying purpose of the criminal offense exception in Bowman is twofold.[25] On the one hand, the United States has the right “to protect itself from harmful conduct — irrespective of the locus of this conduct.”[26] On the other hand, a presumption exists that Congress would not both “enact a statute designed to serve this protective function, and — where the statute proscribes acts that could just as readily be performed outside the United States as within it ... undermine this protective intention by limiting the statute’s application to United States territory.”[27] By reading the Bowman language to limit the criminal offense exception to crimes of fraud or obstruction against the Government, I believe the majority ignores the underlying rationale of the exception to the presumption against extraterritoriality.
*71 Child pornography, particularly over the Internet, is just the type of offense that falls squarely within the Bowman criminal statute exception to the presumption against extraterritoriality.[28] Child pornography is not an “inherently domestic” crime because it can be received from and sent to the United States by a few simple key strokes on the computer. Images of minors engaging in sexually explicit conduct proscribed by the CPPA can travel through the Internet’easily, providing ready access to pedophiles.[29]
Therefore, the first underlying reason for the presumption against extraterritoriality— that Congress legislates with domestic concerns in mind — is inapplicable to offenses related to trafficking child pornography. Concluding that the Congress did not intend to reach those individuals who can simply download pornographic images to a website from another country and e-mail them through servers that are located in the United States is inconsistent with Congress’ goal of eradicating child pornography. The majority’s holding “greatly ... curtail[s] the scope and usefulness”[30] of the CPPA by concluding that § 2252A does not apply extra-territorially.
Furthermore, the other underlying reason given for the presumption against extraterritoriality — to avoid unintended clashes with the governments of foreign countries — is also inapplicable to offenses targeted by the CPPA. It is well settled that the United States can assert jurisdiction over offenses that occur outside the territorial jurisdiction of the United States, but that affect the United States.[31] And the United States Government is not invading some right or taking away some interest of a foreign government by prosecuting those individuals who send child pornography into the United States from that foreign country or who receive child pornography that has been sent through the United States. For example, in United States v. Corey,[32] the defendant was a United States citizen who lived in the Philippines and in Japan during his employment with the Air Force as a civilian postmaster. When he was accused of the aggravated sexual abuse of his stepdaughter, neither the Philippines nor Japan protested the United States’ assertion of jurisdiction over the defendant, even though he was physically located in those countries when he committed the offenses.[33] “Quite the contrary, both countries have abjured any interest in prosecuting [the defendant], no doubt recognizing that the case involves internal U.S. matters.”[34]
Of course the question in this case is whether Germany would protest U.S. jurisdiction over Appellant. And the answer is certainly no. Because of the Status of Forces Agreement that exists between the United States and Germany, Germany agreed that the United States would have the right to exercise jurisdiction over all military *72 servicemembers that the U.S. sends to Germany.[35]
The actions of other countries support the United States’ assertion of jurisdiction over a U.S. citizen who violates a statute proscribing child pornography. “Every nation has criminalized the sexual abuse of children, and the vast majority of states have enacted legislation against child pornography.”[36] Additionally, “[ijnternational conventions on the rights of children favor the strict enforcement of such laws and lend support to the assertion of extraterritorial jurisdiction of these types of eases.”[37] Therefore, asserting federal U.S. jurisdiction is particularly appropriate in light of the nature of Appellant’s offenses.[38]
II. Plain meaning of the CPPA
The question of whether the presumption against extraterritorial application is rebutted for a particular statute “is a matter of statutory construction” that turns on whether Congress intended that a particular statute have extraterritorial application.[39] Therefore, the tools of statutory construction should apply. As articulated by Judge Learned Hand, the most important aspect of statutory construction is to look to the meaning of the words of the statute and discern the legislature’s intent in adopting those words.[40] Furthermore, “[wjherever possible, statutes should be construed in a commonsense manner ... honoring plain meaning ... and avoiding absurd or counterintuitive results.”[41] I believe that denying the CPPA extraterritorial effect is counterintuitive in light of the plain meaning of § 2252A and Congress’ intent to eradicate all forms of child pornography in passing the CPPA.[42]
Section 2252A can be divided into four types of child pornography offenses: (1) knowingly mailing or transporting; (2) knowingly receiving and distributing; (3) knowingly reproducing; and (4) knowingly selling or possessing. The proscription on mailing, shipping, or transporting in “foreign commerce” applies to all four types of offenses.[43]
The Supreme Court has defined “foreign commerce” as commerce between the United States and a foreign nation.[44] I believe the CPPA’s use of the “foreign commerce” lan *73 guage defines the scope of materials Congress intended to reach — those child pornography materials that have traveled in foreign or interstate commerce — and is more than just a jurisdictional hook. In other words, the inclusion of the “foreign commerce” language was not “a straightforward reference to the source of authority of Congress for proscribing these acts as criminal in the first instance, i.e., the Commerce Clause,”[45] but rather, a description of the material prohibited under the statute. “By proscribing the distribution of child pornography in ‘foreign commerce,’ Congress intended the criminal sanctions to apply even where some part of the criminal conduct occurred outside the territorial limits of the United States.”[46] Therefore, just as the statute applies to an individual who sends child pornography from a city in one state to another state, commonsense and logic would dictate that “Congress would be equally interested in preventing that same citizen from making the same distribution to a [U.S. city] from a foreign country.”[47]
Appellant used his Hotmail and Yahoo! email accounts, which are located on a server in the United States, to send and receive email messages with embedded or attached images. Because Appellant was in Germany and outside of the military base when he sent and received the images, the CPPA would reach his acts only if it has extraterritorial application. In considering the extraterritorial application of the CPPA, I find persuasive the reasoning of Judge Hoeveler of the United States District Court for the Southern District of Florida. He stated that the United States would “unquestionably have authority to prosecute a person standing in Canada who fires a bullet across the border which strikes a second person standing in the United States.”[48] So U.S. law applies extra-territorially because the actor is located outside of the territorial borders of the United States.
Because of the unique facts of this ease, it is particularly appropriate that the CPPA have extraterritorial application. “Given the fact that cyberspace has no borders and distance is [sic] in that realm is irrelevant, there is no reason why U.S. courts should not eschew reliance on traditional notions of territoriality and directly rule that such statutes have extraterritorial application.”[49]
“All nations of the world recognize ‘the principle that a man who outside of a country willfully puts in motion a force to take effect in it is answerable at the place where the evil is done.... ’ ”[50] Similar to a bullet shot from another country, an image of child pornography can be “shot” across borders with the touch of a computer key. And like the individual standing in Canada who fires a bullet into the United States, the U.S. servicemember in Germany who sends or receives the child pornography is subject to U.S. federal jurisdiction.
The plain language of the statute reaches Appellant’s acts of possessing, sending, receiving, and reproducing child pornography that has been “mailed, shipped or transported in interstate or foreign commerce.”[51] The “foreign commerce” language of the statute is satisfied by Appellant’s admission that he used Hotmail and Yahoo! accounts to send, receive, and store the pornographic images. Moreover, this link to the United States, by sending the images through and storing the images in Internet servers located in the United States, makes it even more implausible that Congress did not intend the CPPA to reach conduct like Appellant’s.
Based on the plain meaning of the statute, it appears that Congress wanted to explicitly extend jurisdiction over those individuals *74 who possess child pornography not only within the territorial boundaries of the United States, but also on any land or building under the control of the United States.[52] In other words, Congress’ addition of the “on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government” language clearly establishes jurisdiction over an individual who admits to being on property “under the control of the United States” when he possessed the obscene material.[53] Because Appellant admitted to being on property “under the control of the United States” — his barracks at the Cambrai Fritsch Kaserne, a United States Army installation in Darmstadt, Germany — his offense of possessing child pornography on a United States military installation is proscribed by the CPPA.
The majority argues that this language would “just as easily apply only to ... domestic military installations.”[54] We have explicitly rejected such a reading of “territory under the control or jurisdiction” of the United States. In United States v. Wilmot,[55] we held that this language included in the Narcotics Control Act of 1956[56] made the statute applicable to drug offenses committed at Yokota Air Force Base in Japan.
I agree with the majority that neither the “foreign commerce” language nor the “special maritime and territorial jurisdiction of the United States” language alone evidences a clear congressional intent for a statute to apply extraterritorially.[57] But the question is not whether particular words within the statute can be defined to establish extraterritorial jurisdiction, but whether Congress intended the statute itself to apply to Appellant’s offenses.[58] As discussed in further detail below, the CPPA was enacted as part of a comprehensive congressional scheme aimed at eradicating child pornography. I believe that interpreting the plain language of the CPPA, its structure and the comprehensive scheme of the entire statute, leads to the conclusion that Congress clearly meant for the CPPA to apply extraterritorially to reach Appellant’s acts in this case. The key question is whether the Congress that passed the CPPA intended to prohibit or allow the possession of child pornography on a U.S. military base overseas. The answer is obvious.
Relying on only two criminal cases — this Court’s 1977 opinion in United States v. Gla *75 due[59] and Gatlin,[60] a Second Circuit ease— the majority dismisses the multiple opinions of other federal courts that interpret the Bowman exception to apply more broadly than solely to offenses that involve fraud or obstruction against the Government.[61] The majority opinion is also inconsistent with precedent from our intermediate level appellate courts which, although not binding on this Court, have construed the CPPA and decided that it applies extraterritorially.[62]
III. Comprehensive scheme of the CPPA
When determining whether a statute applies extraterritorially, courts are not “limited to the text of the statute itself. To the contrary, [courts] are permitted to consider ‘all available evidence’ about the meaning of the statute, including its text, structure, and legislative history.”[63] In 1996, Congress added § 2252A to Chapter 110 of Title 18 of the United States Code, which defines the offenses related to the Sexual Exploitation and Other Abuse of Children.[64] The history of the CPPA can be traced to 1977 when Congress passed the Protection of Children Against Sexual Exploitation Act.[65]
In the time period between the initial enactment of the 1977 Act and today, Congress *76 has repeatedly emphasized its intent to eradicate the exploitation of children and has acted on this intent by continuously expanding federal jurisdiction over offenses involving child pornography wherever they occur. For example, regarding a 1996 hearing on the CPPA, Senator Joseph Biden noted that Congress has “kept a sharp eye on the problem of child pornography, and where [it] has found gaps in the coverage of the criminal law, [it] ha[s] moved quickly to fill them.”[66] Thus, when the “computer was [first] becoming an increasingly important tool of the child pornographer,” Congress reacted by “making it a federal crime to transport child pornography using a computer in addition to the mails.”[67] In 1998, Congress passed the Protection of Children from Sexual Predators Act, modifying and adding additional statutes to 18 U.S.C. §§ 2251-2257.[68] As Senator Leahy observed:
The goal of [the act] is to provide stronger protections for children from those who would prey upon them. Concerns over protecting our children have only intensified in recent years with the growing popularity of the Internet and World Wide Web. Cyberspace gives users access to a wealth of information; it connects people from around the world. But it also creates new opportunities for sexual predators and child pornographers to ply their trade.[69]
Numerous courts agree that Congress has created a “comprehensive scheme” to combat and eradicate child pornography.[70] These courts typically quote the language from Bowman to conclude that the section applies extraterritorially because to hold otherwise would “greatly ... curtail the scope and usefulness of the statute.”[71] For example, inferring the exercise of extraterritorial power of 18 U.S.C. §§ 2251(a) and 2252(a) from the nature of the offenses defined in each statute, as well as Congress’ other legislative efforts to eliminate child pornography, the Ninth Circuit in Thomas determined that Congress created a comprehensive statutory scheme to eradicate sexual exploitation of children.[72] Because “[p]unishing the creation of child pornography outside the United States that is actually, is intended to be, or may reasonably be expected to be transported in interstate or foreign commerce is an important enforcement tool .... [I]t [is] likely that under section 2251(a) Congress intended to reach extraterritorial acts that otherwise satisfy statutory elements.”[73] The same principle applies to Congress’ intent in enacting 18 U.S.C. § 2252A.
*77 IV. Conclusion
I agree with the majority’s decision that Appellant’s guilty plea to specification 1 is improvident under O’Connor and that his guilty pleas to the other CPPA-based specifications are improvident to the lesser included offenses under clauses 1 and 2 of Article 134 under Mason. Therefore, I concur in part.
I disagree, however, with the majority’s determination that the CPPA does not apply extraterritorially to reach Appellant’s offenses. I believe the Bowman exception to the presumption against extraterritoriality applies in this case based on the nature of the offenses which the CPPA targets and because to deny application of the exception would greatly curtail the scope and usefulness of the CPPA. Congressional intent for a statute to apply extraterritorially can be inferred in criminal statutes, even in the absence of an explicit statement, based on the text of the entire statute, its legislative history and structure. A reading of the CPPA, together with the comprehensive scheme of the Act and repeated efforts by Congress to eradicate child exploitation and expand federal jurisdiction over these types of offenses, shows a clear congressional intent for the CPPA to apply extraterritorially to Appellant’s acts in this case. Therefore, I must respectfully dissent in part.
Finally, I note that today’s opinion construes a generally applicable federal criminal statute rather than a Uniform Code of Military Justice provision. While federal circuit precedent exists on both sides of this issue, the majority’s holding is against the weight of authority. This issue cries out for our superior court to settle this dispute among the federal courts of appeals.

. 58 M.J. 450 (C.A.A.F.2003).

. 18 U.S.C. § 2251A (2000).

. 60 M.J. 15 (C.A.A.F.2004).

. Uniform Code of Military Justice, UCMJ, 10 U.S.C. § 934 (2000).

. See United States v. Bowman, 260 U.S. 94, 97, 43 S.Ct. 39, 67 L.Ed. 149 (1922).

. The Honorable Learned Hand, In Commemoration erf Fifty Years of Federal Judicial Service, 264 F.2d 6, 28 (2d Cir.l959)(proceedings of a special session of the United States Court of Appeals for the Second Circuit, Apr. 10, 1959).

. Id.

. Id.

. Id.

. The most perplexing part of today's result is that it allows a servicemember accused of violating the CPPA to be prosecuted domestically for sending the child pornography over the Internet, but not for his other offenses directly related to the same pornography. The result of the majority’s holding is that the servicemember can be prosecuted "domestically” for sending pornography from an off-base Internet cafe in Germany. But he cannot be prosecuted for possessing that *69 same pornography in his barracks on a United States military installation, or for receiving or reproducing the child pornography over the same U.S.-based Internet servers that establish the jurisdictional basis for the sending charge.

. See, e.g., United States v. Noriega, 746 F.Supp. 1506, 1512-13 (S.D.Fla.l990)(the United States would be exercising extraterritorial jurisdiction to prosecute "a person standing in Canada who fires a bullet across the border which strikes a second person standing in the United States”); United States v. Baker, 609 F.2d 134, 136 (5th Cir.l980)(the United States exercises extraterritorial jurisdiction to reach offenses committed in the "marginal sea” which is located just past the "territorial sea” and between three and twelve miles off the coast).

. See Walter C. Dauterman Jr., Internet Regulation: Foreign Actors and Local Harms — at the Crossroads of Pornography, Hate Speech, and Freedom of Expression, 28 N.C.J. Int'l L. & Com. Reg. 177, 183 (2002)("[The] view that the Internet is somehow beyond national regulation ignores the realities of cyberspace. While it is true that the transnational nature of the Internet may make jurisdictional issues more complicated ... [gjiven that the Internet is populated by real people causing real harm, there is no reason to believe that [it] is beyond the jurisdictional scope of national regulation.”).

. 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)(noting the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States ... serves to protect against unintended clashes between our laws and those of other nations which could result in international discord” (internal quotations omitted)(quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20-22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963))).

. Id. at 246, 111 S.Ct. 1227.

. Id. (internal quotation marks omitted)(quoting Foley Bros., 336 U.S. at 285, 69 S.Ct. 575).

. 260 U.S. at 95-96, 43 S.Ct. 39.

. Id. at 97, 43 S.Ct. 39.

. Id. at 98-103, 43 S.Ct. 39.

. Id. at 98, 43 S.Ct. 39.

. Id.

. United States v. Vasquez-Velasco, 15 F.3d 833, 839 (9th Cir.1994) (quoting United States v. Felix-Gutierrez, 940 F.2d 1200, 1204 (9th Cir.1991)(internal quotation marks and citations omitted)); see also Baker, 609 F.2d at 136; United States v. Wright-Barker, 784 F.2d 161, 166-67 (3d Cir.1986). See generally Christopher L. Blakesley & Dan Stigall, Wings for Talons: The Case for the Extraterritorial Jurisdiction Over Sexual Exploitation of Children through Cyberspace, 50 Wayne L.Rev. 109, 124 (2004)(asserting that, in certain situations, the United States will ignore the general rule against extraterritorial application, and assert jurisdiction "over nationals who commit crimes abroad even though the appropriate statute did not explicitly declare that it applied extraterritorially”).

. Baker, 609 F.2d at 137.

. See Martinelli, 62 M.J. 52, 57-58 (C.A.A.F. 2005).

. See 260 U.S. at 96, 43 S.Ct. 39.

. See United States v. Bin Laden, 92 F.Supp.2d 189, 194 (S.D.N.Y.2000)(holding the Bowman exception to the presumption against extraterritoriality applies to various criminal statutes, such as statutes prohibiting the malicious destruction of property owned or possessed by the United States or the killing in the course of an attack on a federal facility involving a dangerous weapon, but also holding that the exception does not apply to the statute penalizing murder within the "special maritime and territorial jurisdiction of the United States”).

. Id.) see also Blakesley & Stigall, supra note 21, at 141-42 ("The Constitution interposes no bar as such to the extraterritorial application of criminal law,” and thus, if Congress proscribes extraterritorial conduct, “United States law is satisfied.").

. Bin Laden, 92 F.Supp.2d at 194.

. See Blakesley & Stigall, supra note 21, at 152 ("Cyberspace is a wonderful tool for education, communication, and entertainment, giving users access to massive volumes of information and connecting people around the world. Unfortunately, this has also generated new opportunities for predators and pornographers to victimize children.”); Dauterman, supra note 12, at 177-78 ("The Internet, like the telephone and the printing press, has revolutionized the way people communicate, providing a global audience with instant access to a wealth of political, cultural, and scientific data____ Unfortunately, though, there is a much darker and sinister side to the Internet, one full of hate speech and pornography. ... Sexual deviants have used the Internet to exchange pictures of children being forcibly raped and sodomized.”).

. See Blakesley & Stigall, supra note 21, at 153— 54 ("With the recent technological advances in communication, child exploitation has become an international problem. There can be no doubt that the Internet makes children targets for pedophiles around the globe. As an international system, the Internet ... is considered the absolute best hunting ground (for a) pedophile, and the most efficient pornography distribution engine even conceived.” (internal quotations and citations omitted)).

. Bowman, 260 U.S. at 98, 43 S.Ct. 39.

. Id.

. 232 F.3d 1166, 1169 (9th Cir.2000).

. Id. at 1171.

. Id.

. See Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces art. VII, § 1(a), June 19, 1951, 4 U.S.T. 1792; see also Martinelli, 62 M.J. at 56-57 (Crawford, J., dissenting); James B. Roan & Cynthia Buxton, The American Military Justice System in the New Millennium, 52 A.F. L.Rev. 185, 191 n. 32 (2002)(noting that the “German government has agreed to a general waiver of their jurisdiction due to the United States military's proven ability to handle disciplinary problems through the [Uniform Code of Military Justice]”).

. Dauterman, supra note 12, at 203.

. Id. at 204 (discussing that the Convention on the Rights of the Child, created by the United Nations in 1989, provides basic international guidelines for the protection of children from sexual exploitation via child pornography); see also Allison M. Scott, Note, From a State-Centered Approach to Transnational Openness: Adapting the Hague Convention with Contemporary Human Rights Standards as Codified in the Convention on the Rights of the Child, 11 Ind. J. Global Legal Stud. 233, 235 n.18 (2004) (noting that the Convention on the Rights of the Child has been ratified by 192 countries, and that only the United States and Somalia have not ratified it, but the United States has formally signed the Convention).

. See Dauterman, supra note 12, at 219 (noting that the "universally recognized consensus that child pornography is an evil that should be eliminated enables states to prosecute offenders outside of its borders").

. Martinelli, 62 M.J. at 56-57 (n. 4) (citing Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)(Scalia, J., dissenting)).

. Judge Learned Hand, supra note 6, at 28.

. United States v. Carroll, 105 F.3d 740, 744 (1st Cir. 1997) (internal citations omitted).

. See Blakesley & Stigall, supra note 21, at ISO-58 (discussing how federal laws proscribing child exploitation offenses must apply extraterritorially based on the international nature of the offense due to recent technological advances in communication, the comprehensiveness of the legislative scheme that has already been judicially determined to apply extraterritorially, and American jurisprudence).

. See 18 U.S.C. § 2252A(a)(l)-(3), (5).

. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 193, 6 L.Ed. 23 (1824).

. Martinelli, 62 M.J. at 60.

. United States v. Martens, 59 M.J. 501, 504 (A.F.Ct.Crim.App.2003).

. Id.

. Noriega, 746 F.Supp. at 1512-13; see also Church v. Hubbart, 6 U.S. (2 Cranch) 187, 234, 2 L.Ed. 249 (1804)("[A nation's] power to secure itself from injury, may certainly be exercised beyond the limits of its territory.”).

. Blakesley & Stigall, supra note 21, at 147.

. Noriega, 746 F.Supp. at 1513 (citing Rivard v. United States, 375 F.2d 882, 887 (5th Cir.1967)).

. See 18 U.S.C. § 2252A(a)(l)-(3).

. See 18 U.S.C. § 2252A(a)(5)(A), (B). Section 2252A(a)(5)(A) proscribes knowingly possessing child pornography in the "special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government.” Section 2252A(a)(5)(B) proscribes knowingly possessing child pornography that has been "mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."

. See 18 U.S.C. § 2252A(a)(5)(A).

. Martinelli, 62 M.J. at 61.

. 11 C.M.A. 698, 702, 29 C.M.R. 514, 518 (1960).

. Pub.L. No. 84-728, 70 Stat. 567 (repealed 1970).

. See Martinelli, 62 M.J. at 59-61.

. Because the issue in this case is whether Congress intended the CPPA to apply extraterritorially to reach Appellant's offenses, and because I believe that it does, there is no need to decide whether 18 U.S.C. § 7(3) (2000), which defines "special maritime and territorial jurisdiction of the United States,” has extraterritorial application in this case. Compare United States v. Gatlin, 216 F.3d 207, 220 (2d Cir.2000)(holding that 18 U.S.C. § 7(3) does not apply extraterritorially to reach appellant's offense of sexual abuse of a minor on a United States military installation in the Federal Republic of Germany), with Corey, 232 F.3d at 1183 (holding that 18 U.S.C. § 7(3) applies extraterritorially to appellant’s offense of sexual abuse of a minor on an Air Force base in Japan and in an off-base private apartment building in the Philippines). See also Blakesley & Stigall, supra note 21, at 147 (asserting that the holding of Gatlin, 216 F.3d at 220, is based on the same flawed reasoning as the holdings in Corey, 232 F.3d at 1183, and United States v. Cream, 58 M.J. 750, 755 (N.M.Ct. Crim.App.2003), because "[tjhere is no need to look to 18 U.S.C. § 7(3) or traditional notions of territoriality to find jurisdiction over the acts of pedophiles abroad. Given the fact that cyberspace has no borders and distance in that realm is irrelevant, there is no reason why U.S. courts should not eschew reliance on traditional notions of territoriality and directly rule that such statutes have extraterritorial application.”).

. 4 M.J. 1, 5 (C.M.A.1977). I believe our Court in Gladue misread the Bowman exception to the presumption against extraterritoriality and defined it too narrowly. A statute may not indicate, on its face, a congressional intent to be given extraterritorial application. But such intent can be "readily implied" from the nature of the offense targeted by the statute and if to deny extraterritorial application "would be greatly to curtail the scope and usefulness of the statute!].” Wright-Barker, 784 F.2d at 167 (citations and internal quotation marks omitted); see also Vasquez-Velasco, 15 F.3d at 839 (citing Felix-Gutierrez, 940 F.2d at 1204); Baker, 609 F.2d at 136.

. 216 F.3d at 211 n. 5. Interestingly, although the majority relies on footnote five in the Gatlin opinion to support its narrow reading of the Bowman language, the Second Circuit itself rejected such a narrow reading in an earlier opinion. Citing Baker, 609 F.2d at 139, the Second Circuit held that the “intent to cause effects within the United States ... makes it reasonable to apply to persons outside United States territory a statute which is not expressly extraterritorial in scope.” United States v. Orozco-Prada, 732 F.2d 1076, 1087-88 (2d Cir.1984)(internal quotation marks omitted).

. See Vasquez-Velasco, 15 F.3d at 843 (concluding that the statute applies extraterritorially to defendant’s act of murdering both a U.S. citizen and a legal resident alien of the U.S. in Mexico to further a drug trafficking enterprise); United States v. Thomas, 893 F.2d 1066, 1068-70 (9th Cir. 1990)(holding that 18 U.S.C. § 2251(a) applied extraterritorially to defendant's acts in Mexico of engaging a minor in sexually explicit conduct for the purpose of creating a visual depiction of that conduct, mailing visual depictions of the conduct, and receiving the material); Baker, 609 F.2d at 136-39 (concluding that the statute proscribing the possession of narcotics with the intent to distribute applies extraterritorially to possession beyond the three-mile limit of the "territorial sea”); United States v. Harvey, 2 F.3d 1318, 1327-30 (3d Cir.1993)(holding that sentencing guideline addressing the offense of causing a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct applies when the offense occurs in the Philippines). See also United States v. Bredimus, 234 F.Supp.2d 639, 650 (N.D.Tex.2002)(deciding that 18 U.S.C. § 2251A applies extraterritorially to traveling in foreign commerce with the intent to use minors to produce visual depictions of sexually explicit conduct); Felix-Gutierrez, 940 F.2d at 1204 (holding that the Bowman criminal offense exception applies to the murder of a Drug Enforcement Administration agent in Mexico).

. See, e.g., United States v. Kolly, 48 M.J. 795, 797 (N.M.Ct.Crim.App.1998)(holding that 18 U.S.C. § 2252(a)(2) applies extraterritorially to the receipt of child pornography the appellant ordered while stationed in Hawaii, and had sent from a supplier in Florida to Japan, where the appellant was later stationed); Martens, 59 M.J. at 505 (concluding that Congress intended 18 U.S.C. § 2252(a)(2)(A) to apply extraterritorially to the receipt of child pornography at Ramstein Air Base in Germany); United States v. Pullen, 41 M.J. 886, 888 (A.F.Ct.Crim.App.1995) (holding that the language of 18 U.S.C. § 2252(a)(4)(A) is broader than that in the statute at issue in Wilmot, 11 C.M.A at 700, 29 C.M.R. at 516, and is therefore a clear expression of Congress’ intent to apply it extraterritorially to the possession of child pornography on Clark Air Base in the Philippines).

. Gatlin, 216 F.3d at 212 (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)).

. Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, div. A, tit. I, § 121(3)(a), 110 Stat. 3009 (codified as amended at 18 U.S.C. § 2252k (2000)).

. Pub.L. No. 95-225, 92 Stat. 7 (codified as amended at 18 U.S.C. § 2251 (2000)).

. Statement of Sen. Joseph R. Biden (regarding hearing on Child Pornography Prevention Act)(June 4, 1990), available at 1996 WL 292976 (F.D.C.H.).

. Id. at 1-2.

. Pub.L. No. 105-314, 112 Stat. 2974 (1998).

. 144 Cong. Rec. S12263 (daily ed. Oct. 9, 1998) (statement of Sen. Patrick Leahy).

. See Harvey, 2 F.3d at 1327-29 (holding that 18 U.S.C. § 2251 was enacted as part of Congress' continuing effort to contain evils caused on American soil by foreign as well as domestic suppliers of child pornography, and to deny extraterritorial application of the Act would “greatly curtail the scope and usefulness” of the statute); Martens, 59 M.J. at 504 (concluding that, because the CPPA includes several provisions that clearly reach conduct occurring outside the United States, "the statutory framework compels the conclusion that Congress intended it to apply broadly to counter the sexual exploitation of children”); Bredimus, 234 F.Supp.2d at 649-50 (holding that 18 U.S.C. § 2251A should apply extraterritorially because, given the location of the statute in the criminal portion of the U.S.Code and the nature of the offense, the section was enacted to expand Congress’ statutory scheme to combat sexual exploitation of children, both domestic and abroad, and because it "only makes sense” that the statute would apply to the conduct of United States citizens on foreign soil; otherwise, the comprehensive scheme to combat international trafficking of child pornography and sexual exploitation of children could not be effectively implemented as contemplated by Congress); Kolly, 48 M.J. at 797 (holding that 18 U.S.C. § 2252(a)(2) of the CPPA applied extraterritorially because “to allow a U.S. citizen in the United States who ordered child pornography through the United States postal service to escape prosecution simply because he is overseas when he finally receives it would greatly ... curtail the scope and usefulness” of the CPPA).

. Bowman, 260 U.S. at 98, 43 S.Ct. 39.

. Thomas, 893 F.2d at 1068-69.

. Id. at 1069 (internal footnotes omitted).